IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>ADAM CAIN,<br><br>Defendant. | CRIMINAL ACTION NO. 2:15 cr 130 |

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

March 24, 2016

BEFORE: THE HONORABLE ARENDA WRIGHT ALLEN
United States District Judge

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
By: ELIZABETH YUSI
Assistant United States Attorney
Counsel for the United States

FEDERAL PUBLIC DEFENDER'S OFFICE
By: RODOLFO CEJAS
Assistant Federal Public Defender
Counsel for the Defendant

(Hearing commenced at 11:02 a.m.)

**THE CLERK:** United States of America versus Adam Cain, Criminal Case Number 2:15 CR 130.

Miss Yusi, is the government ready to proceed?

**MS. YUSI:** The government's ready. Good morning, Your Honor. With me I have Special Agent Dave Desy with the FBI.

**THE COURT:** All right. Agent Desy, good to meet you. And, Miss Yusi, it's good to see you this morning.

**THE CLERK:** Mr. Cejas, is the defendant ready to proceed?

**MR. CEJAS:** Yes. Good morning, Your Honor.

**THE COURT:** All right. Mr. Cejas, it's good to see you as well. If you and your client could please come to the podium so he could be sworn, I would appreciate it.

**THE CLERK:** You do solemnly swear, or affirm, that the testimony you're about to give in this case, shall be the truth, the whole truth, and nothing but the truth, so help you God.

**THE DEFENDANT:** Yes.

**THE COURT:** All right. Mr Cain, it's good to see you this morning as well.

On December 10, 2015, with a written plea agreement you appeared before Judge Krask of our court and you pled guilty to Count 3 of the indictment and it charges you with

use of facility of interstate commerce to entice minor to engage in sexual activity in violation of Title 18, United States Code, Section 2422(b). Judge Krask accepted your plea and continued the matter for sentencing. And I hereby accept your plea of guilty as well and find you guilty of that count.

And then I have reviewed the presentence report that was prepared on February 18, 2016, along with the new information and the addendum which was prepared on March 15, 2016, by Mr. Jason Cole. And he is the probation officer that's seated in the box, jury box.

And the government has no objections to the PSR. And Mr. Cejas does have objections to paragraphs 16 through 21, and that's the cross reference arguing that the evidence doesn't demonstrate that you engaged in the conduct for the purpose of producing a visual depiction. And you believe, or Mr. Cejas believes, that the proper guidelines are calculated in paragraphs 11 through 15 of the PSR versus paragraph 16 through 21.

All right. Mr. Cejas, have you had an opportunity to review the PSR and the new information and the addendum with your client?

**MR. CEJAS:** Yes, I have.

**THE COURT:** All right. And other than the objection that I've just noted, are there any other errors in the

report?

**MR. CEJAS:** No. No, ma'am.

**THE COURT:** All right. More importantly, Mr. Cain, did you review the PSR and the new information and the addendum with Mr. Cejas?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right. Did you have adequate time to review the information with Mr. Cejas?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right. And other than the objection I just noted is everything else in the PSR and the new information in the addendum true and correct?

**THE DEFENDANT:** No.

**THE COURT:** No, it's not true and correct?

I'm sorry. Other than the objection that I noted already, is everything else in the PSR -- the presentence report and the addendum and the new information true and correct?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** And is the PSR an accurate reflection of your history and characteristics?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right. All right. That being the case, I'll hear from the government first on the objection and then you, Mr. Cejas.

**MR. CEJAS:** Thanks, Judge.

**THE COURT:** And your response. All right, Miss Yusi.

**MS. YUSI:** Your Honor, I would like to call Special Agent Desy to the stand briefly.

**THE COURT:** This pertains to the cross reference?

**MS. YUSI:** Correct.

**THE COURT:** All right. Absolutely.

DAVID DESY, called by the government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. YUSI:

Q. Good morning. Could you introduce yourself to the court please.

A. Good morning. My name is David Desy. I'm an FBI agent in our Norfolk Field Office.

**REPORTER:** Could you spell your last name.

Q. I was just going to ask if you could spell your last name.

A. Desy is spelled D E S Y, Delta Echo Sierra Yankee.

Q. And are you the case agent on the prosecution against Mr. Cain?

A. Yes, I am.

Q. And are you familiar with the victim Jane Doe in the case as well as the allegations?

A. Yes, I am.

Q. Now in this particular case -- I'm not going to go into the background because it's all forward or before the court. I'm going to -- can you tell us about, just briefly, what was found on the defendant's cellphone?

A. There were five pictures that were found on his cellphone. Two of them were of the victim. One close up of her vagina. The second one was of her buttocks. And then the other three pictures were pictures of her as well as the defendant when they were having sex.

Q. Okay. And were these all taken at the same time or various times?

A. Four of them were taken on the same day, which was August 8th, and then -- 2015. And then the fifth one was taken three days earlier on August 5th.

Q. Okay. I'm going to show you what I'd like to mark as Government's Exhibit 1. Can you tell us what that is?

A. That's the picture that was taken on August 5th of the victim's vagina close up.

Q. Okay. And I'm going to show you what's -- I'm going to mark as Government's Exhibit 2. Can you tell us what those are?

A. Those are the four pictures that were also on Mr. Cain's cellphone that were taken on August 8th.

Q. Okay.

A. It's the one of the buttocks and then the three of when they had sex.
Q. Okay. Did you talk to Mr. Cain about these images?
A. I did, yes.
Q. And what did he say?
A. He said that they were of the victim and that he had taken the two that were of the close ups of the vagina and the buttocks but that she had taken the three when they had had sex. He had said something to the fact of she wanted him to have something to remember him by.
Q. Okay. Who's phone -- but with his phone?
A. With his phone.
Q. All right. And then did -- was the victim ever -- she was interviewed?
A. She was.
Q. And did she say anything specifically just about the images being taken?
A. She did. She was upset when she learned that Mr. Cain said she had taken the photos. She said that that was a lie and that he was the one that wanted the photos and that he had taken them with his cellphone.
Q. Did she recognize herself in these images?
A. She did, yeah.

**MS. YUSI:** Those are all my questions, Your Honor.

**THE COURT:** All right. Thank you, Miss Yusi.

Mr. Cejas.

CROSS-EXAMINATION

BY MR. CEJAS:

Q. In your discussions with Jane Doe, she did not indicate that there was any discussion about photographs prior to them actually being taken, is that correct?

A. I don't remember her talking about it, no, sir.

Q. And that this --

**MR. CEJAS:** All right -- all right. I don't have any further questions.

**THE COURT:** All right. Thank you, Mr. Cejas. Anything additional, Miss Yusi.

**MS. YUSI:** No, Your Honor.

And for purposes, I'm not sure if these images need to be admitted, and if they were to be admitted, I would like them under seal obviously.

**THE COURT:** All right. I'll do that. Can I see them real quick, Mr. White.

Then I have a question for you, Agent Desy.

Based on your investigation do you know whether or not the defendant had his phone with him when he would travel up to Virginia to pick up Jane Doe?

**THE WITNESS:** Yes, ma'am. He did have his phone. I both asked him and her, and they both said he always had it with him.

**THE COURT:** All right.

**THE WITNESS:** I think these three were also.

**THE COURT:** All right. Anything in light of my question, Miss Yusi?

**MS. YUSI:** No, Your Honor.

**THE COURT:** Mr. Cejas?

**MR. CEJAS:** No, Your Honor.

**THE COURT:** All right. I do. I have one more question actually. What is the relationship? Is it a niece?

**THE WITNESS:** I believe they are second cousins.

**THE COURT:** Second cousins.

**THE WITNESS:** Yes.

**THE COURT:** I'm going to admit those. And we are going to place them under seal and affix them to Mr. Cole's original PSR. Second cousins?

**THE WITNESS:** Yes, ma'am.

**THE COURT:** All right. Anything else, Mr. Cejas?

**MR. CEJAS:** No, Your Honor. I think our information is that I believe that they are third cousins but I don't --

**THE COURT:** Third, okay.

**MR. CEJAS:** Beyond that, no.

**THE COURT:** All right. Sir, thank you for your testimony.

**THE WITNESS:** Yes, ma'am.

**THE COURT:** All right.

**MS. YUSI:** Your Honor, just to clarify, maybe Mr. Cole can clarify. If they are affixed to his PSR, does that mean it's going to be traveling to BOP with him?

**THE COURT:** Will it go to the BOP? I don't want it to go to the BOP.

**MR. CEJAS:** Yes, I believe it go to the BOP.

**MR. COLE:** Yes, it will. I believe anything attached to the presentence report will go.

**THE COURT:** No, I don't want that. So I'll just place it under seal and get it back to Madam Lorraine.

**MS. YUSI:** Thank you, Your Honor.

**THE COURT:** No, you're all right.

All right. Anything evidence on this issue, Mr. Cejas, or just argument?

**MR. CEJAS:** Just argument.

**THE COURT:** All right. I'll be glad to hear from you, Miss Yusi.

**MS. YUSI:** Your Honor, as stated in the PSR, we do believe the cross reference to 2G2.1 the production guideline is appropriate.

And I know the defendant relies on the Palomino-Coronado decision which is for a production conviction and does not deal with a cross-reference which is, in my opinion, and based on the language much more lenient in terms of what we have to prove.

First of all, the cross reference specifically says that it's to be construed broadly.

And, secondly, you know, we don't have a beyond a reasonable doubt standard but a lower standard for sentencing purposes. But regardless of the burden, we do believe that we have showed that in this particular case, Mr. Cain, while it wasn't his primary purpose, they didn't talk about it, it was a purpose.

And in the Cox opinion, in the Fourth Circuit, they specifically say it doesn't have to be a single-minded purpose that he transports or uses the child to produce these an images but it is one purpose. And for someone to pose someone, particularly the one of the buttocks, they are posing this person and then they are taking an image and they are doing this on purpose and it's purposeful conduct.

So we clearly believe that the cross reference is appropriate in this case.

**THE COURT:** All right. Thank you, Miss Yusi. Mr. Cejas.

**MR. CEJAS:** Yes, Your Honor.

Your Honor, first of all, let me state that we understand that Coronado -- Palomino-Coronado dealt with proof beyond a reasonable doubt but the cases that it cited, the Fourth Circuit used in reaching its opinion, were cases that were not necessarily proof beyond a reasonable doubt.

And it did a lengthy examination of what is required in order for there to be evidence that the crime was committed with the purpose of taking -- taking these photographs.

And so, what we would suggest, and certainly understand that this is not beyond a reasonable doubt. This is preponderance, but I think what is good about the Palomino-Coronado decision is that it went through a variety of factors and examined it thoroughly and those were cases where the standard was preponderance of the evidence.

So I think when you look at the number of photographs, the certain poses, videotaping, all of these things, they are simply not here.

In the case cited -- and of course I address this in my brief so I'm not going to belabor it so much, but I think the number of photographs, for example, in the case that was cited, US versus Ortiz-Graulau, if I'm pronouncing that correctly, there were over 50 photographs taken and the court in that case held that there was a strong inference simply because of the number of photographs. Here we have five.

And the court asked -- in fact asked Agent Desy whether or not it had been used with his cellphone. Well again, in that case, and I think -- I think in almost in any situation, particularly in these days, the fact that someone has their cellphone with them is not a factor I would suggest that can be considered. If he always carried the cellphone

with him, and he carried it as he was traveling, that's not like -- unlike many other individuals.  That's safe to say that many of us in here would have our cellphones if we could bring them into court.  Certainly the court security has his cellphone.  I'm sure many others that have their cellphones. It's not unusual to travel with a cellphone.

It would be different if he did not travel with a cellphone and then he produced it simply for the purpose or at the time of taking these pictures.  It would have been different if the pictures were taken with a camera as it was in one of the additional cases that we cited.

In fact, in the case -- in Cox itself it was a camera.  It was not a cellphone.  It was -- there was evidence of recording equipment, a tripod and so forth that had been used in cases where the cross reference has been upheld.  And that's not the case here.

There is also -- there is also additional evidence in Cox.  For example, in Cox there was a use of threats. There is money -- use of money and alcohol.  There was also an attempt by the defendant in that case to obstruct justice.

Simply not enough evidence, even at the preponderance level, to justify applying the cross reference. I think one of the things that I think that's significant is Agent Desy testified that it was his idea to take them.  So my question was what -- had that been discussed prior.  The

answer is he doesn't have any information that it was.  And

that is significant because in these other cases where the

cross reference was applied, there was some prior discussion.

I want you to look this way.  I want you to look that way so

I can have the pictures.  It was done prior to the travel.

And so in this case all the evidence suggest quite the

contrary.  We have the conversations that are listed in the

presentence report.  There is no conversation of I plan to do

this.  I want you to dress this way.  I want you to pose this

way.  I want you to do all these things.  It wasn't done

prior.

          And so since the goal of the cross reference is to

address conduct that suggest an intent to produce photographs

or to travel for the purpose of making photographs as you're

engaged in the sexual activity, I simply don't believe that

it's enough.  There is no prior conversation.  There is no

large number of photographs.  The only thing used here is a

cellphone which for all we know, based on his testimony, is

that this is something that he carries all of the time.

          So again, I don't believe that it's appropriate,

even under the preponderance standard, it's simply not

enough.  And even though it is to be construed broadly, that

doesn't mean just because there is a picture, then the cross

reference applies.  There has to be more.  And the government

hasn't cited anything more other than the fact that it was

his idea. That may have been, but the question is was it his idea prior. Did they discuss it on the long trip from Virginia to North Carolina? Was there camera equipment? Was anything else involved? And the answer is no.

So I believe under those circumstances it should not apply. Thank you, Your Honor.

**THE COURT:** Thank you, Mr. Cejas. Anything additional, ma'am?

**MS. YUSI:** No.

**THE COURT:** All right. The guideline -- we are looking at paragraph 16 through 21 of the PSR. And the applicable cross reference 2G1.3(c)(1) states that if the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply 2G2.1, if the resulting offense level is greater than that determined above.

So the court is going to overrule the objection and we're relying on the case of United States versus Cox at 744 F.3d 305, Fourth Circuit, 2014 decision. United States Court of Appeals for the Fourth Circuit held that the purpose requirement of 2G2.2, that is, that the defendant acted for the purpose of producing a visual depiction of sexual explicit conduct "is satisfied anytime one of the defendant's

purposes was to produce a visual depiction of the sexually explicit conduct." "Producing the depiction need not be the defendant's sole, or primary, purpose."

In this instance, the court finds that although Cox interprets the cross reference listed in 2G2.2 rather than 2G1.3(c), which is at issue here, the exact same wording is used in both cross reference subsections in relation to when the cross reference should be applied.

The court also finds that in accordance with application note 5 for 2G1.3(c)(1) and the cross reference must be construed broadly.

So based on all the facts before the court, the arguments of the government, the court is going to overrule the objection. And the report will remain as written by Mr. Cole.

Okay. Mr. Cejas, if you and your client could come back to the podium please.

All right. Mr. Cain, and the court's going to adopt the factual statements contained in the presentence report as its finding of fact as written by Mr. Cole. And so that means that your offense level is a 42 and that takes into account that three-level reduction for acceptance of responsibility. Two of those points you controlled. One point the government controlled. So the court's granting the government's motion. And then your criminal history category

is a two and your guideline range is 360 to life. Hearing no objections from the lawyers or the probation officer, Mr. Cain, do you understand what I just said?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** Okay. And then the supervised release is five to life. And hearing no objections by the lawyers or the probation officer, sir, do you understand what I just said?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right. Any additional evidence or just argument, Miss Yusi?

**MS. YUSI:** Just argument.

**THE COURT:** And how about you?

**MR. CEJAS:** Just argument.

**THE COURT:** All right. If you gentlemen can have a seat, we'll hear from the government, then we'll hear from Mr. Cejas.

**MS. YUSI:** Your Honor, we incorporate our position paper and I'm not going to rehash everything that we have stated in it, but we do believe that under the 3553 factors a sentence of 360 months would be appropriate and not greater than necessary to achieve the purposes of sentencing.

In terms of the history and characteristics of this offense and of the defendant himself, as the defendant was told by the magistrate court when he changed his plea, the

court will look at all relevant conduct. And this includes not just this victim but the one that he had prior to this.

This is a man who found at least two victims by exploiting trust relationships with his family. First, in 2008, as the presentence report talks about, when he was 33 years old, he was convicted of a sexual offense of a child under 13 years old. And we know this to be another relative of his.

He was allowed to plead to indecent liberties with a child, and basically given a slap on the wrist with a suspended sentence and probation. He was given a huge break to clean up his life, get help, address whatever things were going on within him that had him seek out these underage girls for sexual purposes, but he also couldn't even do that. He violated his probation, which -- and he's still given his suspended sentence, and he was still under probation during the current offense.

If we fast forward to 2015, we are talking about a different relative. This time she was 15 years old on a different side of the family who did not necessarily know about his criminal history.

They started talking romantically and then sexually online, and then they talked about what they could do together sexually when he picked her up when he would drive from Roanoke Rapids, North Carolina, to Windsor, pick her up

and then bring her back to his house.

And this house in Roanoke Rapids was the same house where he lived with his mother and stepfather. He had her stay in his room and had sex with her.

We also know from earlier testimony and what he admitted to in the statement of facts that he also memorialized the abuse in the images.

We also know from her text messages that we talked about in our position paper that she was trying to get pregnant. She wanted to get pregnant. This is clearly a very naive, troubled girl, who does not understand what the implications of this would be at 15 years old. And instead of being someone, an adult, who would, you know, kind of help this, he has sympathy for her, said don't worry, baby, we'll try next time when you're more fertile. It's very, very disturbing on so many levels. It's sad for this girl but it's also very scarry that this adult man is encouraging, encouraging this.

Clearly, the 15-year old has a lot of issues. She is looking for love and attention. Then she found this defendant who took advantage of these issues, much to her detriment.

Now, Your Honor, Mr. Cain was given a pass in his first time and he was given a lower sentence -- or an indecent liberties, so a lot of enhanced penalties that may

have normally applied if it was a sex offense under state law

don't apply in this particular case, but he sought this

relationship out.  He sought this abuse out.  This is not

something that just happened next door or he just fell into

this.  He sought it out.  He drove up there.  He got her.  He

talked her online.

The Government avers that there is not much that's

probably going to give him pause from future behavior of

this, and it's very disturbing and the court needs to worry

about society, about protecting society, about protecting

other relatives or minors that this particular defendant

might be from.  He has his own child.  He was married during

this time, but that did not stop him.  He surrounded himself

with victims.

Now in terms of other sentences available, Your

Honor, I realize the coercion and enticement is a little bit

of a different charge that he pled to.  We see a lot more

production, which he was originally charged with and this

obviously involves production, things like that, but these

are very heavy sentences because these are very serious

crimes, and ones that have a lot of implications.  And in

this particular case a lot of implications for a 15-year old

girl that's still having to go on with her life.

Your Honor, defendant's action were heinous.  And

his crimes of conviction, one of the worst kind that this

court can see. And in this particular case we do believe that the guidelines are reasonable. And the 360-month sentence would be at the very low end of the guidelines and therefore we are asking that the court impose that. Thank you.

**THE COURT:** Thank you, Miss Yusi. Mr. Cejas.

**MR. CEJAS:** Thank you, Your Honor.

**THE COURT:** You're welcome.

**MR. CEJAS:** Obviously, we addressed our position in the brief that we submitted, so I'll be relatively brief.

I think I'm not going to try to make light of the offense or the activities. I would just suggest that 30 years is greater than necessary under these circumstances. He is 40 years old. He will be -- if the court imposed that sentence, he would -- he would be 70 years old before he got out. I'm assuming that he didn't face any civil commitment or anything of that nature.

So I believe that what is sufficient but not greater than necessary is a sentence closer to 180 months. It is a stiff sentence. Yes, he received light treatment before but I do not believe under these circumstances that 30 years is warranted.

He will be on supervised release for the remainder of his life. I know that we ask for supervised release not to exceed 15 years. I don't believe that it's absolutely

necessary but I'm guessing that that will not occur, so I know he will be on supervised release for probably for the remainder of his life.

So under these circumstances when he gets out, it will be a completely different world that he looks at. Completely different life that he will have for himself. He will have undergone years and years of treatment, which he did not undergo before. To that extent we are asking the court to consider recommending that he be confined in Butner for the treatment program there, and secondarily Devens. I believe those are the programs on the East Coast, but Butner is closest to his parents and his siblings. And they have still maintained contact with him despite what's occurred here.

These are serious charges. I'm not going to make light of them. I'm not going to suggest that it doesn't warrant significant punishment, but he did confess to the FBI. He drove up from Roanoke Rapids to the FBI Office in Chesapeake. He certainly was under no obligation to do that. He didn't try to flee. And he pled guilty, and I believe that a guilty plea should be worth something. This is not something that was -- he maintained his right to go to trial and then have this victim testify which would have been even more trauma. So I think that that is something to consider. It is worth something. And it is -- 30 years is just greater

than necessary under these circumstances.

Thanks, Judge.

**THE COURT:** All right. Thank you, Mr. Cejas. Anything additional, Miss Yusi?

**MS. YUSI:** No, Your Honor.

**THE COURT:** All right. Mr. Cain, if you can join Mr. Cejas at the podium please, I would appreciate it.

All right. Mr. Cain, I know Mr. Cejas has told you you have the right to make a statement, and if you want to, now would be the time to do so. If you don't want to make a statement, I will not hold it against you. And if you're not sure what to do, please speak to Mr. Cejas.

**THE DEFENDANT:** Yes, ma'am. I just want to say that I am deeply sorry for what happened. And if I could go back, I -- it wouldn't have happened, but I can't change the past. I can only change the future.

And I hope to some day get out, and maybe -- even though I might not see her again, but be able to take care of my daughter as far as support goes and stuff like that. I realize that I probably won't never see her again because my circumstances but I still like them know that I provided for her, if it's possible.

**THE COURT:** All right.

All right. Mr. Cain, and I know Mr. Cejas has reviewed the factors with you, but I'm going to do it as

well.  And so you know, I've got to consider the 3553(a)
statutory factors, and I've got to consider the offense and
your criminal history; seriousness of the offense is a factor
I'm looking at; respect for the law is a factor I'm looking
at; punishment is going to be a factor.

Deterrence as it pertains to you.  There is two
types of deterrence.  General deterrence, if somebody else is
out there doing this type of thing maybe they won't, but more
importantly, in this case, specific deterrence to make sure
you don't ever do this behavior again.

The public is a concern.  Jane Doe is not here, but
she is here as far as I'm concerned.  Her spirit.

The guidelines are 360 to life.  I'm going to look
at your actual conduct, the role, acceptance, obstruction,
and then I'm required to consider treating anybody with
similar offenses with similar criminal histories equally.

And so I've got my little chart that I keep up here
in these types of cases.  And so the only case that I've had
like this since I've been on the bench is US versus Sandler,
which is at 215 CR 4, and it was the same charge that you
got.

And the facts of that case, that defendant
communicated with a 13-year old Jane Doe via computer via
Facebook chat.  And he told Jane Doe he loved her.  He told
her to stick things in her vagina.  Told her to have sex with

a dog.  Communicated with extremely explicit chat language.
So those are the facts of that case.  And the guideline range
for that gentleman ended up being 188 to 235 months.  His
criminal history category was a one.  And so that's the only
other similarly-situated defendant that I've had on my plate.

So I'm considering that, and the facts of that case.

Then when I look at the nature and circumstance of
the offense, I always highlight certain factors for the
court.  So, number one, we are talking August of 2015.
Number two, M.M. tipped the police.  And that was a question
whether or not she was privy to the prior facts of the
conviction, so I'm like, okay, what's up with this family.

So in my notes I wrote I'm glad that M.M. tipped the
police.  So that's a good thing about the case.  I'm always
looking for the good stuff that I can find.

At that time when she called the police she said
that you, and you were 40 at that time, had traveled to
Windsor, Virginia, from Roanoke Rapids, North Carolina, to
have sex with Jane Doe who was 15.  So we go to Google
because I wasn't real sure where Roanoke Rapids.  Is it in
relation to Virginia, but to drive one way is an hour and a
half.  So it was an hour and a half trip.

Second factor, you're using your computer to
facilitate the sexual relationship with her.  And it looks
like that M.M. had given the girl the tablet.  And the girl

wasn't even supposed to be on the tablet, but when M.M. looked at it, she discovered the sexual and romantic topics. So your relationship with the girl has caused the girl to be disobedient to M.M. and so that's a factor that the court noted.

I consider the chat of August 8, 2015, between you and Jane Doe. And it's -- what I wrote in my notes it's disturbing. You're saying, yes baby. She is saying, I don't think we will have kids. You're saying why. Baby, have some faith. Baby, we can try when you're most fertile. So what if it doesn't happen now. We have time, okay.

And so it was just this dialogue, this intimate dialogue sounds like a regular couple planning to have a child. So that was disturbing to the court.

You were on probation at the time. That was the disturbing to the court.

The agents rolled up there to execute the search warrant and they interviewed you right on the scene it looks like. And so you say you were leading her on in the belief that they were in a romantic relationship because she was depressed and suicidal. That she had an infatuation with you and I think it was the other way around. That you had never kissed her on her lips or touched each other sexually.

So those were all lies, notwithstanding the fact you later on got your head together and came up to the FBI up

here. But initially out of the gate, you're not being truthful with the agents that are there.

Then we find out that she had last visited about two weeks ago, and she stayed for a week.

Then the images. Before seeing them, I had just wrote in my notes the vagina, the naked buttocks, and the vulva, and I have now seen the actual images, so that is disturbing to the court.

And I do credit you though for going to the FBI, and then subsequently it took you about a week or so, but you admitted to having sex with her on August 28, 2015. You said that she is the female in all the photos of your cellphone. Admitted to taking the pics of her vagina and her buttocks on the 5th and 8th of August. You allowed her to use the cellphone to take the three other pictures. Now the agents tell me that she denied that this morning, but that's what I've written in my notes. You admitted that you had sex with her and took the pictures thereafter.

And that you had the phone with you when you traveled up to get her. So I thought that was all good.

So what I wrote in my notes is I'm glad on September 1 when you did meet with the local agents that you purged yourself of all that because that's a good start for what needs to happen I think if you want to not commit this behavior again.

At the end of the day, Jane Doe is the victim that causes us to meet. And so now you're a federal sexual offender. And I'm looking at punishment, specific deterrence as it pertains to you, and the general public.

I do think it's a great decision that once you met with him and confessed, that you also met with the Judge of our court and pled guilty and you met with Mr. Cole, and you admitted your guilt as well. And as you know, if you had not gotten that three-level reduction for acceptance of responsibility your guidelines would be life. So you have gotten credit for that. The guidelines are not life. The guidelines are 360 to life, so I think that's a great decision and I hope you continue to be truthful with all your treatment providers when you're in the Bureau of Prisons.

Your criminal history wasn't that bad I didn't think. Initially you have the failures to appear, so you got zero points for that. But then, the indecent liberties conviction, and the government's alluded to it and I'm looking at it as well, and so I need to and so it's telling me that the victim regarding your state conviction was 12 years old, M. Cain, who had been sexually assaulted by her uncle, you, who were 33 years old. You were living in the home with the child. Contact with the victim revealed that you had rubbed your thing against the victim's private part but did not put his thing inside her private part.

Approximately two weeks earlier when the victim's aunt was in the hospital you had the child lie down a cross her bed, both of their pants were down and you rubbed your penis up and down her buttocks. The victim's 10 year old brother looked under the locked door and observed you and the victim's clothing on the floor. And then according to the victim, you had done this several times before. Each time had given her money in the amounts of 20 and 40 dollars in exchange for being able to perform sexual acts upon her beginning when she was six years old.

So the window that we are talking about here seems to be from the age of 6 to 12 for the victim that's identified in that state conviction. The victim did not tell anybody about her uncle because he gave her money and threatened to beat her with a belt. She described the sex acts as something slammie and sticky would come from his private part onto her leg and his breathing would be loud as if he had been running.

The child received a medical evaluation and the investigating officer spoke with the grandmother of the victim. The grandmother advised that she had questioned her granddaughter. And the victim told her that the defendant, you, had not put his penis inside her but had hurt her by doing so with his finger. The victim stated that the defendant had offered her a hundred dollars if she would

allow him to put his penis inside her but she refused.  The

grandmother relayed that the victim and the victim's older

sister, J. Hewett, now 16 years old, had each made

allegations that the defendant, you, had sexually abused them

but had subsequently changed their stories.  The grandmother

recounted knowing -- the grandmother Amy Cain recounted

knowing the defendant since he was 17 years old and he had

reportedly fondled and attempted to have sex with Lorie

Mendez, the biological mother of M. Cain, the 12-year old

victim, when Lorie was 12 to 13 years old.  He had also

previously reported sexual interactions with J. Hewett and M.

Cain several years ago.

J. Hewett confirmed previously seeing you rub your

penis again M. Cain's vaginal area a number of years earlier

when he had been performing similar things to her.  The

defendant had told both girls not to tell and had given them

money after their sexual interactions.  Both had reported the

behavior but had changed their stories out of fear the

Department of Social Services would remove them from Amy

Cain's home.

So I understand that the conviction as it relates to

the 12-year old victim, evidently now what's going on here

because the state authorities allowed you to plead to what

you pled to.  And you got sentenced to what you got sentenced

to.

But what is concerning for the court is that we have for sure the 12-year old victim M. Cain, and then we have for sure J. Hewett, who was about 16 years old at the time, then we have the brother who's peeping in on this mess as well. And then we are not sure about the Lorie Mendez thing.

So my point in saying all this is not to beat you up on all this, and I'm only looking at your conviction as it pertains to the 12-year old victim, but it's clear to the court that you have got to -- if you want to have some solace and cleansing of your conscience and maybe feel good about yourself for the rest of your days, if I were you, I would just purge any of this behavior out of your body, give it to the treatment officials so that they can give you all the tools that they can possibly give you to help you not want to do this type of stuff again. Because notwithstanding what happened or didn't happen, I have to believe that you don't want to be behaving like this and you don't want this sprayed up in the sky for all the world to know.

So I'm just going through all those facts for you. You do with it what you want. If the court were you, I would want to cleanse myself of this so I would at least feel better about myself as a human being.

I make a finding of fact that your risk to re-offend is very, very high.

I've reviewed the PSR as it pertains to your family

and all of your siblings.  I do make a note that there may be evidence that you were physically and emotionally abused by Cain Senior.  And then I also make a note that you were abused at the age of 10 or 11, sexually, from your baby-sitter.  And so maybe that is some of that.

So if there is more evidence of that in your life, I don't know if it is.  I'm only going from what's in the PSR. But if there is any evidence like that that explains maybe why you have the state conviction and now the federal conviction, the court encourages you to reveal all that to the treatment officials down in Butner or Devens because they are experts in their field, and your goal should want to become more wholesome.

Your mother says that you're a good man with a problem.  That you have been her and her husband's primary caregiver and source of financial support.  You were living with her when not driving for work.  Your mother says that you did not instigate the relationship or intentionally become involved with the 16-year old.  She never saw any romantic relationship between you and the victim when the victim was visiting the residence.

And that she, your mom, says you would not have deliberately endangered or engaged in this process.  And I just wrote in my notes I think your mom's in denial.

You're married and separated from Karen.  It was

noteworthy to believe that Karen was mildly retarded and immature, per your mom's statement. So that's -- is she childlike, I don't know, but I just made a note of that.

Physically there is nothing there that the BOP can't handle.

Mental health-wise you completed the sex offender treatment September 21, 2014, as having a satisfactory relapse prevention plan, low risk to re-offend. Wrong. Discharged June 3, 2014, and as we know a year later you're there with Jane Doe. So I don't know how good or bad that system was but again I'm hoping that you purge your life history to the BOP officials and hopefully really get to the bottom of this problem.

No substance abuse issues.

Your education is all laid out.

Employment, I noted that you were a technician assisting high risk needs children in an elementary school. So that was scary for the court as well. And that would have been in late 2007 through January 2008.

So I've considered all of the 3553(a) statutory sentencing factors. And it's the opinion of the court that 360 to life is not greater than necessary if the court focuses in on the punishment, specific deterrence as it pertains to you, and protecting the public, and that is either children outside or children within your home.

The reason that we're meeting is because of Jane Doe. You breached the trust of M.M. and, thank goodness, M.M. found the evidence.

North Carolina to Virginia, approximately an hour and a half one way, and then back to North Carolina and with the cellphone with you along the way. The language between you and Jane Doe on her delicate mind and that language about the baby. You memorialized the acts. You were on probation when you did the crime. It's evidence to the court that you can't control yourself.

I've also considered Government Exhibits 1 and 2, and the testimony of the agent this morning.

You're a repeat offender as it pertains to your relatives and breaching the trust of their guardians, whom obviously needs some in-depth treatment. And it's got to stop. And I'm glad that we are able to stop you. And I only hope, Mr. Cain, that you get a handle on all of this and have an open and honest discussion with all your treatment providers in the BOP so you can clear your conscience.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant Adam Cain is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 360 months.

Upon release from imprisonment you shall be placed on supervised release for a term of 30 years.

Within 72 hours of release from custody of the Bureau of Prisons, you shall report in person to the probation office in the district to which you are released.

As reflected in the presentence report, you present a low risk of future substance abuse, and therefore the court hereby suspends the mandatory condition for substance abuse as defined by Title 18, United States Code, Section 3563(a)(5). However, this does not preclude the probation office from administering drug tests as they deem appropriate.

While on supervision you shall not commit another federal, state or local crime. You shall not unlawfully possess a controlled substance and you shall not possess a firearm or other destructive device.

You shall also comply with the following additional conditions:

You shall participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders, with partial costs to be paid by you, all as directed by your probation officer.

You shall participate in a program approved by the United States Probation Office for mental health treatment. The cost of this program is to be paid by you, all as directed by your probation officer.

You shall waive all rights of confidentiality

regarding sex offender and/or mental health treatment in order to allow the release of information to the United States Probation Office and authorize communication between your probation officer and your treatment provider.

You shall submit to polygraph, penile plethysmograph testing or ABEL assessment for sexual interest as directed by your probation officer as part of your sexual offender therapeutic treatment. The costs of the testing are to be paid by you, all as directed by your probation officer.

You shall not utilize any sex-related adult telephone services, websites or electronic bulletin boards. You shall submit any records requested by the probation officer to verify compliance with this condition including, but not limited to, credit card bills, telephone bills, and cable and/or satellite television bills.

You shall not have any access to or possess any pornographic material or pictures displaying nudity or any magazines using juvenile models or pictures of juveniles.

You shall have no contact with minors unless supervised by a competent, informed adult, approved in advance by your probation officer.

You shall not engage in employment or volunteer services that allow you access to computers or minors.

Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, you shall register with the state's sex

offender registration in any state where you reside or work and attend school, according to the federal and state law and all as directed by your probation officer.

Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, you shall submit to a search of your person, property, house, residence, vehicles, papers, computer, other electronic communication or data storage devices or media, and effects at any time, by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision, upon prior notification and approval by the court or with a warrant.

You shall not possess or use a computer to access any online computer services in any location, including employment, without the prior approval of the probation officer. This includes any internet service providers, bulletin board systems, or any other public or private computer network.

You shall comply with the requirements of the computer monitoring program as administered by the probation office. You shall consent to the installation of computer monitoring software on any computer to which you have access. Installation shall be performed by the probation officer. This software may restrict and/or record any and all activity on the computer, including the capture of keystrokes,

application information, internet use, history, email correspondence and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall also notify others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by you.

You shall consent to the use of WI-FI detection devices to allow the probation officer to detect the presence of wireless signals inside or outside of your residence.

You shall pay for the support of your child in the amount ordered by any social service agency or court of competent jurisdiction. In the absence of such order, payments are to be made on a schedule to be determined by the court at the inception of supervision, based upon your financial circumstances.

The court has considered your negative net worth, lack of liquid assets, your life-style, financial needs, earning potential, and the dependent relying upon you for support. And I find that you cannot pay a fine.

Accordingly, you shall pay the following total penalties: As to Count 3, a $100 special assessment. No restitution. No fine.

And your special assessment shall be due in full

immediately.

At the time your supervision commences, the probation officer shall take into consideration your economic status as it pertains to your ability to pay the special assessment ordered and shall notify the court of any changes that may need to be made to your payment schedule.

Any special assessment payments may be subject to penalties for default and delinquency.

Nothing in the court's order shall prohibit the collection of any judgment by the United States.

As this judgment imposes a period of imprisonment, payment of the criminal monetary penalty shall be due during the period of imprisonment. All criminal monetary penalty payments are to be made to the clerk, US District Court, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

And you shall notify the US Attorney for our district within 30 days of any change of your name, residence or mailing address until the special assessment imposed by the judgment is paid in full.

All right. Mr. Cain, I have a consent order of forfeiture. And it looks like you signed it. Did you review this with, Mr. Cejas?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right. So we're going to place this

in your file as well.

And then in paragraph six of your plea agreement you waived your right to appeal your sentence and your conviction. If you change your mind on those rules, speak to Mr. Cejas. He's familiar with all of that.

Then we're going to recommend to the Bureau of Prisons, Mr. Cain, that they designate you either at Butner or Devens. That's a recommendation. It's not binding. The Bureau of Prisons works for themselves. They don't work for the court but we will put that in your judgment.

And then also the sex offender treatment in both facilities is very good so hopefully you will get in one of those two facilities.

Anything else, Mr. Cejas?

**MR. CEJAS:** No, Your Honor.

**THE COURT:** All right. Miss Yusi.

**MS. YUSI:** Your Honor, we move to dismiss the remaining counts.

**THE COURT:** All right. That motion is granted.

Everybody have a good rest of their day.

(Hearing adjourned at 11:55 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

X_________/s/ Tamora Tichenor________x

Tamora Tichenor

X___3/24/2016__x

Date